UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:__ 3/21/2023
```

MICHAEL MCVICKER

                              Plaintiff,                    21-CV-07445 (SN)

            -against-                                       OPINION & ORDER

COMMISSIONER OF SOCIAL SECURITY,

                              Defendant.

-----------------------------------------------------------------X

SARAH NETBURN, United States Magistrate Judge:

       Michael McVicker seeks review of the decision of the Commissioner of Social Security

(the "Commissioner") finding that he was not disabled under the Social Security Act (the "Act").

The parties have cross-moved for judgment on the pleadings. The Commissioner's motion is

DENIED and McVicker's motion is GRANTED.

## BACKGROUND

I.     **Administrative History**

       McVicker applied for Disability Insurance Benefits ("DIB") on December 11, 2018. See

ECF No. 18, Administrative Record ("R.") at 223. He alleged disability beginning January 11,

2018, due to chronic back and knee pain. R. 240. McVicker's claim was denied initially and

upon reconsideration. R. 16. McVicker requested a hearing before an administrative law judge

("ALJ") to review his case, which was held before ALJ Robert Gonzalez on October 25, 2019.

R. 79. The ALJ issued a decision denying McVicker's claim on March 10, 2020. R. 16-25.

McVicker then requested review by the Appeals Council, which was initially denied on

September 30, 2020, R. 6-10, but this decision was rescinded because the Appeals Council failed

to provide McVicker's counsel with the opportunity to submit new, material evidence, R. 1-4. Ultimately, the Appeals Council denied McVicker's request for review on July 7, 2021, making the ALJ's decision final. R. 6-9; see 20 C.F.R. § 404.981; 42 U.S.C. § 405(g).

## II.     McVicker's Civil Case

McVicker filed his complaint on September 6, 2021, seeking review of the ALJ's decision. See ECF No. 1. He requested that the Court either remand the case for further proceedings or set aside the decision and grant him DIB in light of the additional evidence submitted to the Appeals Council. ECF No. 22, Plaintiff's Brief ("Pl. Br.") at 28. The Commissioner answered by filing the administrative record and the parties cross-moved for judgment on the pleadings. See ECF Nos. 18, 21, 27. The Honorable Jesse M. Furman referred this case to my docket and the parties consented to my jurisdiction on December 14, 2021, pursuant to 28 U.S.C. § 636(c). See ECF Nos. 7, 12.

## III.    Factual Background

### A.     Non-Medical Evidence

McVicker was born in 1982. R. 227. He completed high school and welding training, eventually working as a journeyman ironworker for 16 years. R. 85, 241.

McVicker alleges that he became disabled on January 11, 2017, after he suffered an injury at work and underwent surgery a day later. R. 16, 87. At his hearing, he testified that he used a walker, crutches, and then a cane for a little over a year after his surgery. R. 88. A year after this initial surgery, he underwent a second surgery to remove painful metal surgical hardware from his leg. Id. He reported receiving injections in his back and legs that only "somewhat" relieved his pain. R. 90.

McVicker testified that since his accident, he has experienced weakness, numbness, and tingling in his right leg. R. 91. Because of this pain in his right leg and back, he reported being

able to sit for only 20 minutes at a time, stand for 10 minutes at a time, and walk for 20 minutes at a time. R. 92-93. McVicker stated that he was able to drive soon after his first surgery and a couple weeks after his second surgery. R. 93-94. While he had difficulty accomplishing his personal needs, like bathing and dressing, after his initial surgery, he reported only having trouble bending over to his feet during the hearing. R. 94.

The ALJ asked the vocational expert whether jobs existed in the national economy for a person who can perform a full range of sedentary exertional work. The vocational expert identified three roles. R. 96. The expert testified, however, that if such person could not maintain a full eight hours of employment during the day, they could not maintain employment on a full-time competitive basis. R. 96.

### B.   Relevant Treating Medical Evidence

#### 1.   New York Presbyterian Hospital, Queens

Immediately after McVicker injured his leg at work on January 11, 2017, he was treated at New York Presbyterian Hospital and received surgical care for fractures in his tibia and fibula. R. 402-427. Post-recovery, he followed up with Dr. Elan Goldwyn at New York Presbyterian through September 2017, R. 681, 684, 687, & 689, 692, 694, and received at-home physical therapy for his right knee, R. 357-361. Over the course of his physical therapy, McVicker progressed from non-weight bearing with use of crutches, to full weight-bearing but with a limp and use of a cane. R. 683, 687, 689, 1213. He continued to feel pain associated with a surgical screw. Id.

#### 2.   Dr. Jeffrey Kaplan

In July 2017, Dr. Jeffrey Kaplan provided an orthopedic evaluation of McVicker's right knee. R. 540. McVicker reported increased pain with climbing and descending stairs and walking on inclines. R. 540. He used a cane "at all times when out" and took Aleve for pain "on a near

daily basis." Id. Dr Kaplan's objective evaluation confirmed McVicker's subjective reports of pain, noting that he "walk[ed] with an antalgic gait favoring the right," the palpable hardware along the tibial crest was "tender to palpation," and that his x-rays showed early post-traumatic arthritis. Id. McVicker's flexion was limited to 110 degrees, though he could fully extend his knee. Id.

The following month, McVicker returned to Dr. Kaplan and continued to report knee pain and stiffness, difficulty climbing and descending stairs, and the need for a cane. R. 541. Dr. Kaplan noted McVicker's continued antalgic gait and marked crepitus at the knee with positive patellar grind. Id. His knee flexion was 115 degrees with full extension, and Dr. Kaplan recorded atrophy in his quadriceps, increasing low back pain, a negative straight leg raise, and a trigger point formation in the lumbar paraspinous. Id.

In October 2017, McVicker continued to report knee pain, and pain and tenderness caused by the medical hardware. Dr. Kaplan noted that McVicker was "exquisitely tender over the very prominent screw tip at the medial proximal tibia." R. 542. Dr. Kaplan continued to observe marked crepitus at the knee and 120 degrees of flexion, albeit at "a painful arc of motion." Id. McVicker's atrophy in his quadriceps, limited lumbar motion, and tender trigger point formation in the paraspinous musculature persisted, and Dr. Kaplan continued to assess his post-traumatic low back pain. Id.

The next month, Dr. Kaplan documented the same pain and limitations as he had before: limited lumbar motion, persistent tenderness over the prominent medial proximal tibial screw, marked crepitus at the knee, and positive patellar grind. R. 543.

Dr. Kaplan ordered a lumbar spine MRI, which was conducted on December 12, 2017. R. 367. The MRI showed a posterior annual tear and disk herniation at the L5-S1 level and an

encroachment of the left L5 nerve root, for which clinical correlation was recommend. Id. The MRI also showed right disc herniation at the L4-5 level and posterior bulges at the L2-3 and L3-4 levels. Id.

In January 2018, Dr. Kaplan noted McVicker's continued pain over the prominent medical hardware, which was sticking out and "quite apparent on x-rays" and during his physical exam. R. 544. Subsequently, McVicker decided to remove the surgical screw. Id.

On March 21, 2018, Dr. Kaplan removed the hardware from McVicker's right lower leg and in a follow-up appointment in April, noted that he still had tenderness at the anterior aspect of the knee, which "appear[ed] to be slightly nerve like pain." R. 546. While his lateral plateau fracture was in "acceptable alignment," he still had an antalgic gait. R. 546.

At McVicker's August 2018 appointment, Dr. Kaplan observed atrophy of the right lower extremity and limited motion with 110 degrees of flexion. R. 547. Marked crepitus was present and McVicker continued "ambulating with a cane with an antalgic gate." Id.

In November 2018, McVicker reported pain in his right knee and difficulty with attempts at kneeling or squatting. R. 548. Dr. Kaplan continued to observe marked crepitus at the right knee, a positive patellar grind, and knee flexion to 110 degrees. Id. Dr. Kaplan administered three Euflexxa injections in the right knee, which provided McVicker with pain relief. Id. Yet, at his January 2019 appointment, McVicker still had pain attempting to climb stairs, crepitus at his right knee, and tenderness at his lateral joint line and over the proximal lateral shin. R. 1420.

By February 2019, this pain continued, and McVicker reported "electric sensations going from the proximal fibula down the anterolateral leg." R. 787. Dr. Kaplan observed "a positive Tinel at the fibular head, at the peroneal nerve." R. 787. As a remedy, Dr. Kaplan prescribed ointments. Id. In March and May 2019, however, McVicker's crepitus, patellar grinding, and

positive Tinel at the right knee persisted as well as the pain and limited motion in his back. R. 1426-8. During this time, Dr. Kaplan administered another round of Euflexxa injections to Plaintiff's right knee, which again produced some pain relief. R. 1427-28.

During his July 2019 appointment, McVicker's knee examinations continued to show marked crepitus, flexion to 120 degrees, atrophy in his quadriceps, positive Tinel, and limited lumbar motion. R. 1430.

Dr. Kaplan referred McVicker to physical therapy for his right knee from May through October 2018. R. 1351-53, 1356-57, 1360-61, 1364-67, 1369-70, 1374-79.

### 3. Dr. Aric Hausknecht

Beginning in September 2018, neurologist Dr. Aric Hausknecht treated McVicker's back pain upon Dr. Kaplan's referral. R. 369. In his initial examination of McVicker, Dr. Hasknecht reported a -5 weakness of both ankle dorsiflexors but found the remainder of McVicker's motor strength was intact in the upper and lower extremities. R. 370. Dr. Hasknecht observed tenderness in the lower lumbosacral paravertebral and a positive bilateral seated straight leg test. R. 370. Dr. Hasuknecht conducted an electrodiagnostic study, which revealed evidence of a right peroneal motor neuropathy, a form of nerve damage.[1] R. 373.

In November 2018, McVicker had a positive straight leg raise in a seated position on the left. R. 376. Another electrodiagnostic study revealed evidence of L5-S1 radiculopathy, typically caused by pinched or damaged nerve roots,[2] and a right peroneal sensorimotor neuropathy. R. 378.

---

[1] Motor neuropathy "is damage to the nerves that control muscles and movement in the body." *Peripheral Neuropathy*, JOHNS HOPKINS MEDICINE, https://www.hopkinsmedicine.org/health/conditions-and-diseases/peripheral-neuropathy.
[2] The "spine is made of many bones called vertebrae, and your spinal cord runs through a canal in the center of these bones. Nerve roots split from the cord and travel between the vertebrae into various areas

In February 2019, Dr. Hausknecht reported a positive bilateral seated straight leg raise (which was more prominent on the left side), a L5-S1 disc herniation with associated nerve root impingement, and left L5-S1 radiculopathy. R. 797. Dr. Hausknecht reported McVicker had a moderate restriction of mobility in the lumbosacral spine and numbness and a tingling sensation in his legs. Id.

In April 2019, Dr. Hausknecht again reported McVicker had a positive straight leg raise rest on the left side at 60 degrees and lumbosacral tenderness and spasm. R. 794. In October 2019, Dr. Hausknecht again reported lumbosacral tenderness and positive straight leg raising on the left. R. 1491.

Dr. Hausknecht referred McVicker for physical therapy for his back and he received treatment from February through April 2019. R. 723-64, 1219-59. The notes from these appointments reflect diminished strength, R. 741, but improved strength by April 2019. R. 752.

### 4. Dr. Ronald Mann

Dr. Ronald Mann, an orthopedic surgeon, examined McVicker at least five times as an independent medical examiner for his Workers' Compensation case. At his first appointment on March 27, 2017, McVicker reported only being able to stand and sit for 30 and 20 minutes, respectively, and that he was unable to do daily activities like gardening, driving, vacuuming, sweeping, or running errands. R. 389. Dr. Mann observed swelling, effusion, erythema, and crepitus in the right knee as well as atrophy in the quadriceps. R. 390. He found evidence of a

---

of your body. When these nerve roots become pinched or damaged, the resulting symptoms are called radiculopathy." *Radiculopathy*, JOHNS HOPKINS MEDICINE, https://www.hopkinsmedicine.org/health/conditions-and-diseases/radiculopathy.

marked partial disability of 75% and concluded that McVicker was capable of performing minimal sedentary duties. R. 390-1.

In subsequent appointments in August 2017 and March 2018, McVicker reported an improvement in his limitations, stating that he could walk half a mile, stand for one hour before he had to sit, and sit for half an hour to an hour before changing positions. R. 383, 397. In August 2017, Dr. Mann noted atrophy and weakness in McVicker's quadriceps. R. 384. In March 2018, Dr. Mann noted that McVicker used a cane and again found McVicker to be capable of "minimal secondary duties." R. 385, 400.

In July 2018, McVicker continued to walk with a limp and use a cane. R. 393. Dr. Mann noted that McVicker had atrophy in his right quadriceps and opined that he could return to work avoiding kneeling, bending, climbing, and prolonged walking. R. 393-4.

In May 2019, Dr. Mann observed that McVicker had a negative straight leg raise examination, was neurologically grossly intact in both lower extremities, and had no atrophies despite "slightly decreased motor strength in his right quadriceps compared to his left quadriceps." R. 768-9. Finally, he opined that McVicker had a moderate (50%) partial degree of disability and could work with the same restrictions he noted in July 2018. R. 769, 770.

### 5.  Dr. Jose Colon

Dr. Jose Colon began treating McVicker in April 2019 after being referred by Dr. Hausknecht for a pain management evaluation of his lumbar condition. R. 832. Upon inspection, Dr. Colon noted that McVicker had a positive bilateral seated and supine straight leg raise test as well as a decreased sensation to pin prick bilaterally along the course of the L5 and S1 dermatomes. R. 832. Dr. Colon recommended lumbar epidurals, which relieved McVicker's pain and made it easier for him to walk for prolonged periods. R. 809, 826.

At McVicker's June 2019 appointment, he reported numbness in his left and right buttocks, left and right posterior thigh, left and right posterior thigh, and left and right posterior leg. R. 826. Dr. Colon observed a positive seated and supine straight leg raise test on the left and right legs. Id.

In July 2019, McVicker reported 80% pain relief after receiving his third epidural injection. R. 1407. He continued to experience numbness in his left and right buttocks, left and right posterior thigh, left and right anterior thigh, and left and right posterior leg. Id. However, McVicker's seated and supine straight leg test was positive bilaterally, and he experienced a decreased sensation to pin prick bilaterally along the course of the L5 and S1 dermatome. R. 1408. At this time, Dr. Colon directed McVicker to stay home from work and opined that he was 100% temporarily disabled. R. 1408.

Though McVicker reported that the epidural injections resolved his radicular pain at his September 2019 appointment, his seated and supine straight leg test was positive bilaterally along the L5 and S1 dermatome. R. 837-8. He continued to experience a decreased sensation to a pin prick bilaterally along the course of the L5 and S1 dermatome and experience numbness in his left and right buttocks, left and right posterior thigh, left and right anterior thigh, and left and right posterior leg. R. 838.

### C.    Relevant Non-Treating Medical Evidence

#### 1.  Dr. Rita Figueroa

At the request of the Social Security Administration ("SSA"), Dr. Rita Figueroa performed a consultative internal medicine examination on McVicker in January 2019. R. 621. McVicker reported being able to cook twice a week, launder and shop once a week, and shower and dress daily. R. 622. He could not clean because he could not kneel. Id. Dr. Figueroa observed that McVicker was able to walk on heels, but not on his toes, and had a mild limp. R.

623. He was able to squat 50%, did not need assistive devices, and had limited lumbar motion. Id. His straight leg test was negative bilaterally, his legs were dull to the pin prick sensation bilaterally, and he had 4/5 strength distally at his right leg. R. 623-4. Dr. Figueroa concluded that McVicker will have moderate limitations to repetitive kneeling, squatting, crawling and being up and down ladders as well as to prolonged walking and standing. R. 624.

### 2.  Dr. Andrew Merola

In September 2019, spinal surgeon Dr. Andrew Merola examined McVicker after Dr. Hausknecht referred him for a consultation. R. 1436. At this time, McVicker reported that the conservative pain management for his lower back prescribed by Dr. Colon had failed. Id. This management plan included activity modifications and restrictions, pain medications, physical therapy, and epidural steroid injections. Id. McVicker continued to experience persistent pain in his back, "which radiate[d] into lower extremity, legs, and feet producing . . . numbness, tingling and weakness." Id. Upon examination. Dr. Merola observed that a low back extension at 10 degrees reproduced palpable spasms and pain in the low back, which radiated into the legs. Id. McVicker's straight leg raise in the lower left extremity was at 35 degrees, indicating a positive straight leg test.[3] Id. Like other physicians who examined McVicker, Dr. Merola noted atrophy "greater in the left lower extremity" and determined that he was 100% totally disabled from work and duties. R. 1437.

---

[3]"[A] positive straight leg raise test is determined when pain is elicited by lower limb flexion at an angle lower than 45 degrees." Gaston C. Camino Willhuber and Nicolas S. Piuzzi, *Straight Leg Raise Test*, NATIONAL LIBRARY OF MEDICINE (June 22, 2022), https://www.ncbi.nlm.nih.gov/books/NBK539717/#:~:text=The%20examiner%20gently%20raises%20the,(usually%20L5%20or%20S1).

### 3. Dr. Barry Root

In August 2019, Dr. Barry Root reviewed McVicker's medical records and examined him at the request of his attorney. R. 1440. McVicker reported that he was independent with regard to his activities of daily living, but avoided chores as they provoked pain. R. 1446. He had below normal ranges of motion in his spine, with painful motion in his right side-bend, left side-bend, and extension.  R. 1447-8. While he had 5/5 motor power in most of his lower extremities, he had 4/5 strength in his Extensor hallius longus ("EHL"). R. 1449. Dr. Root observed a positive straight leg raise on the left at 50 degrees, a negative straight leg raise on the right, and concluded that he was totally disabled. R. 1448, 1450.

### 4. State Agency Experts

State agency medical experts Dr. Reynolds and Dr. Siddiqui reviewed McVicker's medical records in February 2019 and May 2019, respectively, but did not conduct a physical examination of him. R. 99. While Dr. Reynolds found that "the claimant's medically determinable impairments could have reasonably been expected to produce the alleged symptoms," he concluded that McVicker's "statements concerning the intensity, persistence and limiting effects of these symptoms [were] generally not consistent with the evidence of record." R. 105. When evaluating McVicker's Residual Functional Capacity ("RFC"), Dr. Reynolds concluded that McVicker could stand or walk for a total of four hours, sit for a total of six hours out of an eight-day workday, and occasionally climb stairs, balance, stoop, kneel, crouch and crawl. R. 105-6. Dr. Reynolds based most of his findings on McVicker's January 2019 examination by Dr. Figueroa, which noted a negative straight leg raise and full range of motion throughout the body. R. 107. Dr. Siddiqui affirmed Dr. Reynolds's findings in May 2019. R. 114-5.

### D.        Evidence Submitted to the Appeals Council

McVicker submitted additional records to the Appeals Council, covering the period between the ALJ hearing on October 25, 2019, and his decision on March 10, 2020. As a preliminary matter, "new evidence submitted to the Appeals Council following the ALJ's decision becomes part of the administrative record for judicial review when the Appeals Council denies review of the ALJ's decision." Perez v. Chater, 77 F.3d 41, 45 (2d Cir. 1996). However, § 404.970(b) and § 416.1470(b) require the evidence to "be new and material and that it must relate to the period on or before the ALJ's decision" Id. Because all the submitted evidence are records from medical appointments and evaluations that took place before March 10, 2020, the evidence is part of the administrative record for judicial review.

#### 1.  Dr. Jose Colon

McVicker submitted records from his October 2019 appointment with Dr. Colon, who observed a positive bilateral seating and supine straight leg test at that time. R. 56. Plaintiff could forward flex in the lumbar spine to 65 degrees and had decreased sensation to pin prick along the course of the L5 and S1 dermatome. R. 56. Later, in January 2020, Dr. Colon again observed a positive bilateral seating and supine straight leg raise test and a decreased sensation to pin prick along the course of the left L5 nerve root. R. 60.

#### 2.  Dr. Merola

McVicker also submitted records from Dr. Merola's November 2019 Workers' Compensation Progress Report. R. 33. Dr. Merola reported a straight leg raise left lower extremity at 35 degrees, indicating a positive straight leg raise, and significant disc collapse at the L5-S1 segment that correlated with McVicker's back pain. Id. He again concluded that McVicker was 100% temporarily totally disabled from work and duties. R. 34.

### 3. Dr. Joel Mittleman

In November 2019, McVicker saw Dr. Joel Mittleman for chiropractic treatment for his lumbar spine. R. 37. McVicker had positive Lindner's bilaterally and a positive left and right straight leg raise. Id.

### 4. Dr. Aric Hausknecht

McVicker also submitted records from his November 2019 and January 2020 appointments with Dr. Hausknecht. In November, Dr. Hausknecht observed a positive bilateral seated straight leg raise test, which was more positive on the left side, and a moderate restriction of mobility in the lumbosacral spine. R. 64. Evaluating an October 3, 2019, MRI of the lumbar spine, Dr. Hausknecht observed left L5 nerve root impingement and associated hypertrophic changes. R. 65. When evaluating McVicker's strength, Dr. Hausknecht found tandem weakness of both hip flexes, 5-/5 weakness of the right hip extensor, and 4+/5 weakness of the left hip extensor. R. 64. In January, Dr. Hausknecht observed lumbosacral tenderness, spasm and positive straight leg raise bilaterally. R. 72.

## IV. The ALJ's Decision

On March 10, 2020, the ALJ denied McVicker's DIB application. R. 16-25. The ALJ identified the administrative and procedural history, the applicable law, and his findings of fact and conclusions of law. Id.

At Step One, the ALJ determined that McVicker had not engaged in any substantial gainful activity since his alleged onset date of January 11, 2017. R. 18. At Step Two, he found that McVicker had four severe impairments: cervical spine fracture, lumbar spine degenerative disc disease, status post knee arthroscopy, and migraines. Id. At Step Three, he determined that none of McVicker's impairments, individually or in concert, met or medically equaled the severity of a listed impartment in the applicable regulations. R. 19; see 20 C.F.R. 404.1520(d),

404.1525, 404.1526. Specifically, the ALJ found that the requirements of Listing 1.04A (disorders of the spine) and 1.02A (major disfunction of a joint) were not met. R. 19.

The ALJ established McVicker's residual functional capacity ("RFC"). Id. He found that McVicker possessed the RFC to perform sedentary work except for work that required occasional climbing ramps and stairs, balancing, stooping, kneeling, crouching, and crawling. Id. Further, the ALJ found that McVicker can never climb ladders, ropes, or scaffolds or work at unprotected heights. Id. At Step Four, the ALJ determined that McVicker was unable to perform his past relevant work as an iron worker. R. 23.

At Step Five, the ALJ concluded that there were jobs existing in significant numbers in the national economy that McVicker could perform. Id. Accordingly, the ALJ found that McVicker was not disabled, as defined by the Social Security Act, between his alleged disability onset date and the date of the decision. R. 25.

## V.      The Appeal's Council's Determination

Following the ALJ's unfavorable decision, McVicker requested that the Appeals Council review the decision. See R. 1. The Appeals Council initially denied his request for review on September 30, 2020, but set aside that decision to consider additional information. Id. Ultimately, the Appeals Council denied the request again, making the ALJ's decision final. Id

## DISCUSSION

## I.      Standard of Review

In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). An ALJ's determination may be set aside only if it is based upon legal error, or it is not supported by

substantial evidence. <u>Rosa v. Callahan</u>, 168 F.3d 72, 77 (2d Cir. 1999) (quoting <u>Balsamo v. Chater</u>, 142 F.3d 75, 79 (2d Cir. 1998)).

"Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Halloran v. Barnhart</u>, 362 F.3d 28, 31 (2d Cir. 2004) (quoting <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971)). The Commissioner's findings as to any fact supported by substantial evidence are conclusive. <u>Diaz v. Shalala</u>, 59 F.3d 307, 312 (2d Cir. 1995); <u>see also</u> <u>Alston v. Sullivan</u>, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder."). Therefore, if sufficient evidence supports the ALJ's final decision, the Court must grant judgment in favor of the Commissioner, even if substantial evidence also supports the plaintiff's position. <u>See</u> <u>Brault v. Soc. Sec. Admin., Comm'r</u>, 683 F.3d 443, 448 (2d Cir. 2012) ("The substantial evidence standard means once an ALJ finds facts, we can reject those facts only if a reasonable factfinder would have to conclude otherwise." (emphasis in original) (citations and internal quotation marks omitted)). Although deferential to an ALJ's findings, a disability determination must be reversed or remanded if it contains legal error or is not supported by "substantial evidence." <u>See</u> <u>Rosa</u>, 168 F.3d at 77.

## II.    Definition of Disability

A claimant is disabled under the Act if they demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). A "physical or mental impairment" is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." <u>Id</u>. § 1382c(a)(3)(D). A claimant will be found to

be disabled only if their "impairments are of such severity that [they are] not only unable to do [their] previous work but cannot, considering [their] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . ." Id. § 1382c(a)(3)(B).

An ALJ must proceed through a five-step process to make a disability determination. See 20 C.F.R. § 404.1520. The steps are followed in order; if it is determined that the claimant is or is not disabled at a step of the evaluation process, the evaluation will not progress to the next step. See id. The Court of Appeals has described the process as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where the claimant is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in 20 C.F.R. pt. 404, subpt. P, app. 1 . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity to perform her past work. Finally, if the claimant is unable to perform her past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

Jasinski v. Barnhart, 341 F.3d 182, 183-84 (2d Cir. 2003) (quoting Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999)).

A claimant bears the burden of proof as to steps one, two, three, and four; the Commissioner bears the burden as to step five. Selian v. Astrue, 708 F.3d 409, 418 (2d Cir. 2013).

## III.    Analysis

### A.    The ALJ's Step Three Determination

McVicker argues that the ALJ incorrectly determined that he did not meet the requirements for Listing 1.04. Pl. Br. at 18. Listing 1.04 concerns disorders of the spine, such as "herniated pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc

disease, facet arthritis, vertebral fracture, resulting in compromise of a nerve root (including the cauda equina) or the spinal cord." 20 C.F.R. § 404, Subpt. P, App. 1 § 1.04. To meet Listing 1.04A, the record must reflect findings of:

> evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss, and if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

Id. McVicker had the "burden to demonstrate that [his] disability met all of the specified medical criteria of a spinal disorder," Otts v. Comm'r of Soc. Sec., 249 F. App'x 887, 888 (2d Cir. 2007) (emphasis in the original), and that he met these requirements "for a continuous period of 12 months," 20 C.F.R. § 404.1509.

As a preliminary matter, the record shows evidence of radiculopathy, which can serve "as a basis for satisfying the first sub-criterion'" of Listing 1.04 requiring a showing of nerve root compression. Abualteen v. Saul, No. 19-CV-2637 (DF), 2020 WL 5659619, at *24 (S.D.N.Y. Sept. 23, 2020) (citing McIntosh v. Berryhill, No. 17-CV-5403 (ER) (DF), 2018 WL 4376417 (S.D.N.Y. July 16, 2018), report and recommendation adopted by, 2018 WL 4374001 (S.D.N.Y. Sept. 12, 2018)). Doctors noted McVicker's radiculopathy during November 2018 and February 2019 appointments, R. 378 & 797, and after the ALJ hearing in November 2019, R. 65. Further, there is abundant evidence that McVicker had limited motion of the spine, the second requirement of Listing 1.04, from October 2017 through August 2019. R. 542, 543, 1427-8, 1430, 1447.

The ALJ did not address these findings and did not identify a lack of evidence of nerve root compression and limited spinal movement as the reason McVicker failed to meet the requirements of Listing 1.04A. Instead, he simply stated,

The claimant's cervical and lumbar spine impairments do not meet or equal the criteria of a medical listing under section 1.04A, disorders of the spine. There is no evidence the claimant's degenerative disc disease results in motor loss or sensory loss and there is no evidence of consistent positive findings on straight leg raise testing in both the sitting and supine positions.

R. 19.

Notably, the ALJ's "brief, conclusory statement[s]" about the lack of evidence indicating motor loss, sensory loss, or consistent positive findings of straight leg raise tests failed to provide a "specific rationale" for his findings. Rodriguez v. Saul, No. 19-CV-9066 (JLC), 2021 WL 738348, at *14 (S.D.N.Y. Feb. 25, 2021) (citations omitted). While the Court of Appeals has held that the court has power to uphold an ALJ's listing determination in the "absence of an express rationale," this power is limited to circumstances where "portions of the ALJ's decision and the evidence before him indicate that his conclusion was supported by substantial evidence." Berry v. Schweiker, 675 F.2d 464, 468 (2d Cir. 1982). "'Remand is appropriate where there is insufficient uncontradicted evidence in the record to support the ALJ's step three conclusion' and the ALJ fails to explain his rationale for why the plaintiff did not meet a listing." Millett v. Berryhill, No. 17-CV-7295 (PGG) (HBP), 2019 WL 2453344, at *24 (S.D.N.Y. Jan. 11, 2019), report and recommendation adopted by, 2019 WL 1856298 (S.D.N.Y. Apr. 25, 2019) (citing Ryan v. Astrue, 5 F. Supp. 3d 493, 507-08 (S.D.N.Y. 2014) ("Because there is evidence that plaintiff's impairments met each of the requirements for listing 1.04(a), the ALJ must provide an explanation of his reasoning as to why he believes the requirements are not met and explain the credibility determinations and inferences he drew in reaching that conclusion."); Torres v. Colvin, 14-CV-479S (WS), 2015 WL 4604000 at *4 (W.D.N.Y. July 30, 2015) ("When a claimant's symptoms appear to match those described in a listing, the ALJ must explain a finding of ineligibility based on the Listings.") (quotation omitted). The ALJ's failure to explain why

McVicker does not meet the requirements of Listing 1.04 requires remand because his decision ignores the evidence in the record that shows he could potentially meet these requirements.

### 1. Motor Loss

First, there is substantial evidence that McVicker suffered motor loss. As stated in Listing 1.04, motor loss can be demonstrated by atrophy with associated muscle weakness or muscle weakness itself. An "[i]nability to walk on the heels or toes, to squat, or to arise from a squatting position, when appropriate, may be considered evidence of significant motor loss." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00E(1). In other areas of his decision, the ALJ noted that during McVicker's January 2019 appointment with Dr. Figueroa, McVicker was able to "walk on his heels. . . [and] squat 50%." R. 20. Yet, the ALJ did not mention that McVicker was unable to walk on his toes and had a 4/5 strength at his right leg distally at this same appointment. R. 623-4. When discussing Dr Figueroa's "persuasive" medical opinion elsewhere in his decision, he failed to reconcile McVicker's ability to walk on his heels with his inability to walk on his toes and limited ability to squat. R. 20. Moreover, the ALJ did not address the abundant evidence of atrophy in McVicker's quadriceps and lower right extremity reported by Dr. Kaplan, Dr. Mann, and Dr. Merola. See R. 384, 390, 542, 547, 1430, 1436. Nor did he address evidence of muscle weakness observed by Dr. Root, Dr. Hausknecht, Dr. Mann, and Dr. Merola. See R. 370 (-5 weakness in both ankle dorsiflexors); R. 1449 (4/5 strength in the EHL); R. 769 ("slightly decreased motor strength in his right quadriceps compared to his left quadriceps"); R. 384 ("There is quadriceps weakness and atrophy noted."); R. 1436 (weakness and atrophy in the lower extremity). Additional evidence McVicker submitted to the Appeals Council also indicates a 5-/5 weakness in the right hip extensor, 4+/5 weakness of the left hip extensor, and tandem weakness of both hip flexors. R. 64. "It may be that there is conflicting or insufficient evidence to establish that [McVicker's] impairments qualify under Listing 1.04A, but it is the obligation of

the ALJ to evaluate conflicting evidence and make that determination, not the Court." Rodriguez, 2021 WL 738348, at *15.

### 2. Sensory Loss

Despite the ALJ's statements to the contrary, the record also reflects evidence of sensory loss. Sensory loss can be demonstrated by diminished sensation to pin pricks and numbness, see Abualteen, 2020 WL 5659619, at * 25, which was noted throughout the record, but went unaddressed in the ALJ's discussion of whether McVicker met the Listing 1.04A requirements, R. 624, 797, 826, 832, 838, 1407-8, 1436. Further, the evidence McVicker submitted to the Appeals Council also indicates that McVicker's decreased sensation to pin pricks persisted, and that he experienced decreased sensation on the left leg. See R. 56, 60, 64. Accordingly, the ALJ also erred in determining that McVicker's condition did not satisfy listing 1.04 based on a lack of evidence of sensory loss.

### 3. Straight Leg Raise Tests

The ALJ's third reason for finding McVicker did not meet Listing 1.04A were inconsistent positive straight leg raise ("SLR") tests. In another part of the decision, the ALJ identified a negative bilateral SLR test observed by Dr. Figueroa. R. 623. Presumably, the ALJ found this result and the negative SLR test observed by Dr. Root in August 2019, R. 1448, to be inconsistent with the positive SLT results observed in November 2018, February 2019, March 2019, August 2019, July 2019, September 2019, and October 2019. R. 376, 794, 832, 1407, 1448, 1436, 1491. Yet, the "ALJ provided no rationale for rejecting the majority of the positive SLR results" and "effectively required [McVicker] to provide only positive SLR tests." Olechna v. Astrue, No. 08-CV-398 (TM), 2010 WL 786256, at *5 (N.D.N.Y. Mar. 3, 2010). By doing so, the ALJ "required greater evidence than the Listing actually demands with respect to the straight leg raising tests" because the "the Listing introduction acknowledges that abnormal findings,

such as positive SLR tests, 'may be intermittent'. . . [and] 'their presence over a period of time must be established by a record of ongoing management and evaluation." <u>Olechna</u>, 2010 WL786256 at *5 (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, Part A, § 1.00(D)). McVicker's seven positive SLR results observed from November 2018 through October 2019 establish that these abnormal results persisted over a period of time. "The ALJ's reliance on a single negative SLR test disregards the language of the Listing introduction, and clearly does not constitute substantial evidence to uphold his finding that [McVicker] does not meet Listing 1.04A." <u>Id</u>.

"While the ALJ noted the various weights he attributed to the opinions of each doctor [elsewhere in the opinion], those weights do not illuminate how the ALJ weighed the specific medical evidence cited above or what inferences the ALJ drew." <u>Perozzi v. Berryhill</u>, 287 F. Supp. 3d 471, 485 (S.D.N.Y. 2018). Here, the ALJ did not evaluate conflicting evidence, explain his reasons for not crediting diagnostic tests and the opinions of Dr. Kaplan, Dr. Menola, Dr. Hausknecht, or explain why there was insufficient evidence to establish motor loss, sensory loss, or positive SLR tests when discussing Dr. Mann's and Dr. Root's opinions.[4]

Together, this medical evidence potentially meets the Listing 1.04A requirements. As such, "[t]his is not a case where the evidence in the record is so uncontradicted or overwhelming as to relieve the ALJ of his obligation to discuss the potential applicability of Listing 1.04(A), or. . . to provide plaintiff with an explanation of his reasoning as to why plaintiff's impairments did not meet the listing." <u>Millett</u>, 2019 WL 2453344, at *25 (quotations omitted). Accordingly, the

---

[4] The ALJ summarily concluded that Dr. Mann's findings were unpersuasive to the extent they were inconsistent with the residual functional capacity and failed to discuss his findings of atrophy. R. 23. Similarly, in other parts of the decision, he dismissed Dr. Root's findings to the extent they assessed McVicker's disabled status and functional abilities—again without discussing evidence of muscle weakness.  R. 23.

ALJ's failure to discuss this evidence warrants a remand. See Perozzi, 287 F. Supp. 3d at 483-84;

Duran v. Colvin, 14-CV-8677 (HBP), 2016 WL 5369481 at *17 (S.D.N.Y. Sept. 26, 2016)

("Because the ALJ failed to fully address the medical evidence that potentially meets the listing

requirements, I cannot conclude that there is sufficient uncontradicted evidence in the record to

provide substantial evidence for the conclusion that plaintiff failed to meet step three.") (citations

omitted).

### B.     The ALJ's RFC Determination

McVicker also contends that there is substantial evidence, submitted before the Appeals

Council, that supports an even more restrictive RFC that would allow for a finding of disability.

Pl. Br. at 24. "Although the documents submitted to the Appeals Council after the ALJ's

decision were not before the ALJ, 'they are now part of the record and should be considered on

remand.'" Wharton v. Berryhill, No. 17-CV-1247 (LTS) (BCM), 2018 WL 5619961, at *18

(S.D.N.Y. Aug. 14, 2018), report and recommendation adopted by, 2019 WL 1410745 (S.D.N.Y.

Mar. 28, 2019) (citing Mercado v. Colvin, No. 15-cv-2283 (JCF), 2016 WL 3866587, at *20

(S.D.N.Y. July 13, 2016)). Accordingly, the court declines to address McVicker's argument that

this evidence, on its own, warrants remand, and instead directs the ALJ to "asses this new

evidence in order to review [McVicker's] claims on a complete record." Vasquez v. Colvin, No.

14-CV-7194 (JLC), 2015 WL 4399685, at *21 (S.D.N.Y. July 20, 2015).

## CONCLUSION

McVicker's motion is GRANTED, the Commissioner's cross-motion is DENIED, and the case is remanded to the Social Security Administration for further proceedings consistent with this opinion. The Clerk of Court is respectfully requested to terminate the motions at ECF Nos. 21 and 27.

**SO ORDERED.**

SARAH NETBURN
United States Magistrate Judge

DATED:    March 21, 2023
             New York, New York